STATE of Delaware

v.

**Glenn E. MacDONALD, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: July 8, 1991.
Decided: July 11, 1991.

Kathleen M. Jennings, and Jeffrey M. Taschner, Deputy Attys. Gen., Wilmington, for the State.

Joseph W. Benson, and Andrew G. Ahern, III, Wilmington, for defendant.

## OPINION

BARRON, Judge.

### I. BACKGROUND

The defendant, Glenn E. MacDonald, is charged with one count of Murder in the First Degree. The crime allegedly occurred on or about September 30, 1990 in New Castle County. The defendant is charged with intentionally causing the death of Julie Spencer by means of strangulation and the infliction of blunt force injuries. Trial is now scheduled to commence on September 23, 1991.

On May 24, 1991, the defendant filed a Motion In Limine seeking to exclude certain statements of the victim allegedly made during the week prior to her death. The defendant also filed on May 24, 1991, a Motion For Additional Discovery seeking specific information with regard to the alleged statements. By Order dated May 28, 1991, the Court directed the State to provide details regarding the statements of Ms. Spencer which it intended to introduce at trial. The State responded in a timely fashion by letter dated May 31, 1991, which set forth a summary of three separate statements the State seeks to introduce in its case-in-chief. These statements are as follows:

1. On Saturday, September 29, 1990, Julie Spencer and her boyfriend Kevin

Schantz were babysitting for Julie's niece at her home. Their friends, Vicki Cunningham and Tom Craft, were also present at Julie's residence. During the course of the evening, Julie received a phone call from a then unidentified party. Later, she told Kevin and Vicki that the caller had been Glenn MacDonald, who told Julie that he had a videotape of himself and Julie engaging in sexual intercourse. Julie told Vicki and Kevin that Glenn wanted to meet Julie in order to give her the videotape.

2. On Sunday, September 30, 1990, Julie Spencer called her boyfriend Kevin Schantz, who was stationed at the Aberdeen Proving Ground in Aberdeen, Maryland. According to Schantz, the call terminated at 6:50 pm with Julie indicating that she intended to meet Glenn MacDonald, presumably at his residence, in order to pick up the videotape. Julie told Kevin that she intended to go skating at the Christiana Skating Rink after meeting Glenn at his house located near the rink.

3. On Tuesday, September 25, 1990, Julie Spencer told Rena Mckee, a friend and co-worker, that she had received a phone call from Glenn MacDonald the previous evening. Spencer told Mckee that Glenn wanted to see her on Sunday evening (September 30) in order to give her a videotape of them engaging in sexual intercourse.

By Order dated May 28, 1991, the Court set a briefing schedule on the issue of the admissibility of said statements. Briefing having been completed, the issue is now ready for decision.

## II. THE LAW

Recently, this Court had the occasion to discuss a similar issue implicating D.R.E. 803(3) which states:

RULE 803. HEARSAY EXCEPTIONS; AVAILABILITY OF DECLARANT IMMATERIAL.

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*   \*   \*   \*   \*   \*

(3) *Then Existing Mental, Emotional Or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.

In *State v. Porter,* Del.Super., 587 A.2d 188 (1990), the Court relied upon the Delaware Supreme Court case of *Derrickson v. State,* Del.Supr., 321 A.2d 497 (1974), decided prior to the adoption of the Delaware Rules of Evidence, and observed:

Testimony showing a statement of present intention or an existing state of mind of the deceased was described by the Delaware Supreme Court in *Derrickson v. State,* Del.Supr., 321 A.2d 497 (1974), as "a universally recognized exception to the hearsay rule." The Court cited with approval the case of *State v. Long,* Del.Ct.O. & T. [32 Del. 380] 123 A. 350 (1923), which announced five requirements as the necessary foundation for the admission of such evidence:

1. The statement must be relevant and material;

2. It must relate to an existing state of mind when made;

3. It must be made in a natural manner;

4. It must be made under circumstances dispelling suspicion; [1]

5. It must contain no suggestion of sinister motives. [2]

The defendant in *Derrickson* had contested the admission of Frank Leister's testimony. Leister had employed the vic-

---

1. The Court in *Derrickson,* explained that "[t]he requirement that the statement be made under circumstances absent suspicion refers to the circumstances surrounding the declaration itself, not the contemplated action related to the declaration." 321 A.2d at 503.

2. Here, "the focus is upon the motive for making the statement, not the nature of the planned activity." 321 A.2d at 503.

tim of the homicide, Wayne McNeal, at Leister's service station where McNeal had worked for several months prior to his death. Shortly before Leister had last seen McNeal, the deceased had asked Leister for time off so that he could accompany the defendant to Delaware to change registration tags on a car. The Supreme Court concluded that the testimony was competent to show McNeal's present purpose or intention when the statement was made. The Court found that the statement was properly admitted, the five foundational requirements having been met.

587 A.2d at 189.

In *Porter,* the Court added four additional admissibility requirements before hearsay evidence is to be admitted under D.R.E. 803(3) in a homicide prosecution so as to ensure a fair trial. These additional requirements are:

1. This evidence may only be admitted in rebuttal after evidence of accident, self-defense, suicide or extreme emotional distress has been presented by the defense;

2. It may only then be admitted if the trial court makes, upon balance, a determination on the record that its probative value is not substantially outweighed by the danger of unfair prejudice, *see* D.R.E. 403;

3. The deceased's statement when made, must not have been too remote in time from the charged offense; and

4. Because such evidence is admitted for a limited purpose, a limiting instruction should be given contemporaneously with the admission of such evidence and as part of the jury instructions at the close of the case, *see* D.R.E. 105.

587 A.2d at 193.

Of significance, *Porter* dealt with alleged death threats made to the victim by defendant. The potential for substantial prejudice in a victim's hearsay statement of her fear of the defendant or of death threats allegedly made by the defendant to a victim is great indeed. Thus, Judge MacKinnon

in *United States v. Brown,* 490 F.2d 758 (D.C.Cir.1973) determined as follows:

The rule then to be distilled from the better reasoned decisions is that a victim's extra-judicial declarations of fear of the defendant are admissible under the state of mind exception to the hearsay rule with a limiting instruction only if there is a manifest need for such evidence, i.e., if it is relevant to a material issue in the case. Where there is a substantial likelihood of prejudice to the defendant's case in the admission of such testimony, it is inadmissible if it bears only a remote or artificial relationship to the legal or factual issues raised in the case. Even where there is substantial relevance, the additional factual matters in the statement may simply be too explosive to be contained by the limiting instruction, in which case exclusion of the testimony is also necessitated.

The trial judge must undertake the familiar balancing process in which the relative degrees of relevance and prejudice are weighed and determined....

490 F.2d at 773, 774.

■ Thus, in homicide cases, "if there is no defense which brings into issue the state of mind of the deceased, evidence of fears or other emotions is ordinarily not relevant. But where a defense such as that of accident or self-defense is interposed ..., courts have generally allowed the admission of evidence of the victim's fears, as probative of the question whether that person would have been likely to do the acts claimed by the defendant." *State v. Parr,* 93 Wash.2d 95, 606 P.2d 263, 267 (1980); *State v. Porter,* 587 A.2d at 191.

It was this potential for prejudice regarding only potentially relevant evidence which the Court had in mind when it ruled that such evidence may only be admitted in rebuttal after evidence of accident, self-defense, suicide or extreme emotional distress has been presented by the defense. *State v. Porter,* 587 A.2d at 193. In the case *sub judice,* we do not have a victim's hearsay statements of her fear of the defendant or of death threats made to her by

the defendant and related by her to others.[3] We have, rather, a situation much more akin to that found in *Derrickson*, to wit: proffered testimony showing the victim's present purpose or intention when the statements were made. The first additional *Porter* requirement is not warranted under the facts of this case since the proffered testimony is simply not *potentially* relevant.

Here, we have a statement of the victim's intent shortly before her death. She allegedly stated on three different occasions that she intended to meet the defendant on the evening of her disappearance. It would be illustrative, at this juncture, to revisit a Supreme Court decision rendered at the end of the last century which touches on the issue now before the Court.

The so-called *Hillmon* doctrine is a particular species of the "state of mind" exception to the hearsay rule. This doctrine takes its name from the United States Supreme Court case of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). The "Hillmon doctrine" was explained in *United States v. Pheaster*, 544 F.2d 353 (9th Cir.1976) *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977), as follows:

> ... [U]nder the *Hillmon* doctrine the state of mind of the declarant is used inferentially to prove other matters which are in issue. Stated simply, the doctrine provides that when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown. From that intention, the trier of fact may draw the inference that the person carried out his intention and performed the act. Within this conceptual framework, hearsay evidence of statements by the person which tend to show his intention is deemed admissible under the state of mind exception. [Appellant's] objection to the doctrine concerns its application in situations in which the declarant has stated his intention to do something *with another person*, and the issue is whether he did so. There can be no doubt that the theory of the *Hillmon* doctrine is different when the declarant's statement of intention necessarily requires the action of one or more others if it is to be fulfilled.
>
> When hearsay evidence concerns the declarant's statement of his intention to do something with another person, the *Hillmon* doctrine requires that the trier of fact infer from the state of mind of the declarant the probability of a particular act not only by the declarant but also by the other person. Several objections can be raised against a doctrine that would allow such an inference to be made. One such objection is based on the unreliability of the inference but is not, in our view, compelling. A much more significant and troubling objection is based on the inconsistency of such an inference with the state of mind exception. This problem is more easily perceived when one divides what is really a compound statement into its component parts. In the instant case, the statement by Larry Adell, "I am going to meet Angelo in the parking lot to get a pound of grass", is really two statements. The first is the obvious statement of Larry's intention. The second is an implicit statement of Angelo's intention. Surely, if the meeting is to take place in a location which Angelo does not habitually frequent, one must assume that Angelo intended to meet Larry there if one is to make the inference that Angelo was in the parking lot and the meeting occurred. The important point is that the second, implicit statement has nothing to do with Larry's state of mind. For example, if Larry's friends had testified that Larry had said, "Angelo is going to be in the parking lot of Sambo's North tonight with a pound of grass", no state of mind exception or any other exception to the hearsay rule would be available. Yet, this is in effect at least half of what the testimony did attribute to Larry.
>
> Despite the theoretical awkwardness associated with the application of the *Hillmon* doctrine to facts such as those

---

**3.** Neither do we have any of the above-enumerated defenses.

now before us, the authority in favor of such an application is impressive, beginning with the seminal *Hillmon* decision itself. *Hillmon, supra,* 145 U.S. 285, 12 S.Ct. 909, was a civil case involving a colorful dispute over certain life insurance claims. The factual issue in the case was whether Hillmon, who had purchased a number of life insurance policies naming his wife as beneficiary, had been killed by the accidental discharge of a gun in a campsite near Crooked Creek, Kansas. If he had been so killed, his wife was entitled to the benefits under the insurance policies. The defendant insurance companies contended, however, that Hillmon was not dead but was in hiding, and that the claims were part of a conspiracy to defraud the companies. While it was undisputed that someone had been killed in the campsite at Crooked Creek, there was complete disagreement as to who the victim was. The defendants in *Hillmon* introduced evidence which tended to show that the body at Crooked Creek was not that of Hillmon, but was that of another man, Frederick Adoph Walters. As part of this attempt to show that it was Walters who was killed at Crooked Creek, the defendants attempted to introduce two letters written by Walters from Wichita, Kansas, shortly before he disappeared, never to be heard from again. In the letters, one written to his sister and the other to his fiancee, Walters stated that he intended to leave Wichita in the near future and to travel with a man named Hillmon. In the letter to his financee [sic], Walters explained that Hillmon was making the expedition to search for a suitable site for a sheep ranch, and that Hillmon had promised him employment at the ranch on very favorable terms. Plaintiff's objection to the introduction of the letters on the ground that they were incompetent, irrelevant, and hearsay was sustained by the trial court.

The Supreme Court summarily rejected the argument that the letters were admissible "as memoranda made in the ordinary course of business," 145 U.S. at 295, 12 S.Ct. at 912, but then held that they were admissible as evidence of Walter's intention:

"The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but *as evidence that,* shortly before the time when other evidence tended to show that he went away, *he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention.* In view of the mass of conflicting testimony introduced upon the question of whether it was the body of Walters that was found in Hillmon's camp, this evidence might properly influence the jury in determining that question." 145 U.S. at 295–296, 12 S.Ct. at 912–913 (emphasis added).

544 F.2d at 376–378.

The California Supreme Court applied the *Hillmon* doctrine in *People v. Alcalde,* Cal.Supr., 24 Cal.2d 177, 148 P.2d 627 (1944), a murder case which parallels the one *sub judice.* One issue before the Court was whether the trial court committed error by allowing in evidence statements made by the victim on the day of the homicide. As here, the testimony was highly incriminating since the victim reportedly said she was going out with Frank, the defendant, on the evening she was murdered. The Court held that *Hillmon* was "the leading case on the admissibility of declarations of intent to do an act as proof that the act thereafter was accomplished." *Id.* 148 P.2d at 631. Finding no error in the trial court's admission of the hearsay testimony, the Court stated:

Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant.

148 P.2d at 632. *See also United States v. Pheaster,* 544 F.2d at 379.

In *Pheaster, supra,* the Ninth Circuit Court of Appeals looked to the then new Federal Rules of Evidence to determine whether the *Hillmon* doctrine survived the codification of the state of mind exception found in F.R.E. 803(3).

Although Rule 803(3) is silent regarding the *Hillmon* doctrine, both the Advisory Committee on the Proposed Rules and the House Committee on the Judiciary specifically addressed the doctrine. After noting that Rule 803(3) would not allow the admission of statements of memory, the Advisory Committee stated broadly that

> "The rule of *Mutual Life Ins. Co. v. Hillmon* [citation omitted] allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed." Note to Paragraph (3), 28 U.S.C.A. at 585.

Significantly, the Notes of the House Committee on the Judiciary regarding Rule 803(3) are far more specific and revealing:

> "However, the Committee intends that the Rule be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon* [citations omitted] so as to render statements of intent by a declarant admissible *only to prove his future conduct, not the future conduct of another person.*" House Report No. 93–650, Note to Paragraph (3), 28 U.S.C.A. at 579 (emphasis added).

Although the matter is certainly not free from doubt, we read the note of the Advisory Committee as presuming that the *Hillmon* doctrine would be incorporated in full force, including necessarily the application in *Hillmon* itself. The language suggests that the Advisory Committee presumed that such a broad interpretation was the prevailing common law position. The notes of the House Committee on the Judiciary are significantly different. The language used there suggests a legislative intention to cut back on what that body also perceived to be the prevailing common law view, namely, that the *Hillmon* doc-

trine could be applied to facts such as those now before us.

Although we recognize the force of the objection to the application of the *Hillmon* doctrine in the instant case, we cannot conclude that the district court erred in allowing the testimony concerning Larry Adell's statements to be introduced.

544 F.2d at 379, 380.

Footnote 18 of the *Pheaster* decision succinctly summarized the objections to applying the *Hillmon* doctrine to cases not dissimilar from the case *sub judice:*

> Criticism of the *Hillmon* doctrine has come from very distinguished quarters, both judicial and academic. However, the position of the judicial critics is definitely the minority position, stated primarily in dicta and dissent.
>
> In his opinion for the Court in *Shepard v. United States,* 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed.2d [L.Ed.] 196 (1933), Justice Cardozo indicated in dicta an apparent hostility to the *Hillmon* doctrine. *Shepard* involved hearsay testimony of a dramatically different character from that in the instant case. The Court reviewed the conviction of an army medical officer for the murder of his wife by poison. The asserted error by the trial court was its admission, over defense objection, of certain hearsay testimony by Mrs. Shepard's nurse concerning statements that Mrs. Shepard had made during her final illness. The nurse's testimony was that, after asking whether there was enough whiskey left in the bottle from which she had drunk just prior to her collapse to make a test for poison, Mrs. Shepard stated, "Dr. Shepard has poisoned me." One theory advanced by the Government on appeal was that the testimony was admissible to show that Mrs. Shepard did not have suicidal tendencies and, thus, to refute the defense argument that she took her own life. The Court rejected that theory, holding that the testimony had not been admitted for the limited purpose suggested by the Government and that, even if it had been admitted for that purpose, its relevance was far outweighed by the extreme prejudice it

would create for the defendant. In rejecting the Government's theory, the Court refused to extend the state of mind exception to statements of memory. In his survey of the state of mind exception, Justice Cardozo appeared to suggest that the *Hillmon* doctrine is limited to "suits upon insurance policies", *id.* at 105, 54 S.Ct. 22 [26], although the cases cited by the Court in *Hillmon* refute that suggestion.

The decision in *Shepard* was relied upon by Justice Traynor of the California Supreme Court in his vigorous dissent from the decision reached by the majority in *People v Alcalde, supra,* 148 P.2d 627. Justice Traynor argued that the victim's declarations regarding her meeting with Frank could not be used to "induce the belief that the defendant went out with the deceased, took her to the scene of the crime and there murdered her * * * without setting aside the rule against hearsay." *Id.* [148 P.2d] at 633. Any other legitimate use of the declaration, in his opinion, was so insignificant that it was outweighed by the enormous prejudice to the defendant in allowing the jury to hear it.

Finally, the exhaustive analysis of a different, but related, hearsay issue by the Court of Appeals for the District of Columbia in *United States v. Brown,* 160 U.S.App.D.C. 190, 490 F.2d 758 (1974), provides inferential support for the position urged by Inciso. The issue in that case was the admissibility of hearsay testimony concerning a victim's extrajudicial declarations that he was "[f]rightened that he may be killed" by the defendant. *Id.* [490 F.2d] at 762. After surveying the relevant cases, the court stated a "synthesis" of the governing principles. One of the cases which was criticized by the court was the decision of the California Supreme Court in *People v. Merkouris,* 52 Cal.2d 672, 344 P.2d 1 (1959), a case relied upon by the Govern-

ment in the instant case. The court in *Merkouris* held that hearsay testimony showing the victim's fear of the defendant could properly be admitted to show the probable identity of the killer. The court in *Brown* expressed the following criticism of that holding, a criticism which might also apply to the application of the *Hillmon* doctrine in the instant case.

"Such an approach violates the fundamental safeguards necessary to the use of such testimony [citation omitted]. Through a circuitous series of inferences, the court reverses the effect of the statement so as to reflect on *defendant's* intent and actions rather than the state of mind of the declarant (victim). This is the very result that it is hoped the limiting instruction will prevent." 490 P.2d at 771 (emphasis in original).

For a frequently cited academic critique of the *Hillmon* doctrine, see Maguire, *The Hillmon Case—Thirty-Three Years After,* 38 Harv.L.Rev. 709 (1925). 544 F.2d at 380 n. 18.

■ Mindful of the possible prejudicial impact of the victim's alleged statements, the Court nevertheless believes that D.R.E. 803(3) encompasses such statements within its scope. So as to minimize any possible *unfair* prejudice, the Court believes that the position as noted by the House Committee on the Judiciary regarding F.R.E. 803(3), *see United States v. Pheaster, supra,* is more in accord with the limited purpose of the evidence and with our Supreme Court's position taken in *Derrickson, supra.* Such evidence would be admissible to show the victim's present purpose or intention when the statements were made and to prove, by inference, her future conduct. Such evidence would not be admissible to show, inferentially, the intent or future conduct of the defendant, in my view.[4]

4. A limiting instruction substantially in the following form would, in the Court's view, be appropriate, assuming the admissibility of the statements:

"Ladies and Gentlemen of the Jury: Statements of the deceased, Julie Spencer, have been al-

lowed as evidence in this trial. You are instructed that this testimony is to be considered by you only in connection with evaluating the present purpose or intent of the deceased at the time when the statements were made, and its effect, if any, on her subsequent conduct. You

Here, the victim's whereabouts on the day of her disappearance are relevant. The proffered statements reflect her then present purpose or intention as they might touch on her whereabouts. In *Commonwealth v. Lowenberg*, 481 Pa. 244, 392 A.2d 1274 (1978), the defendant challenged the admissibility of the deceased's statement that she wanted to see the defendant on the day she was murdered. In that prosecution, the testimony had been offered to establish the deceased's intention to see and confront the defendant concerning a financial matter. The Pennsylvania Supreme Court affirmed the trial court's ruling admitting this evidence as follows:

> Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is therefore because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted....
>
> \* \* \* \* \* \*
>
> In addition to the necessity for such an exception [to the hearsay rule], the admission of this type of evidence is justified because the circumstances in which these utterances were made indicate that they accurately reflected the declarant's state of mind at the time and there was an absence of a motive to deceive. *Commonwealth v. Thomas*, 410 Pa. 160, 189 A.2d 255 (1963), *cert. denied*, 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963) (should be accepted because the declara-

tions were made in a "natural manner"). We find that this testimony was properly within the state of mind exception and that the court was correct in admitting it.

392 A.2d at 1279.

In the case *sub judice*, the Court is unable to conclude, on the present record, whether the conditions of admitting Ms. Spencer's statements of her intent have been met. The proper way in which to test the proffered testimony under the *Derrickson* requirements and the applicable *Porter* requirements is through a hearing held outside the jury's presence prior to the presentation of the State's case-in-chief.[5] *Compare State v. Porter*, 587 A.2d at 193.

### III. CONCLUSION

Based upon the foregoing, the Court will defer a decision on the defendant's Motion In Limine pending a hearing as envisioned above. If satisfied that the requirements for admissibility of the proffered testimony have been met, as those requirements are set forth in this opinion, the Motion will be denied and such evidence may come in during the State's case-in-chief. Otherwise, the Motion will be granted.

It Is So ORDERED.

---

are not to consider this testimony to evaluate the intent or conduct of the defendant, Glenn MacDonald."

5. The Court requests the parties confer for purpose of agreeing to a mutually convenient date for such a hearing.